**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**MAR 9 1998**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

          Plaintiff - Appellee,

    v.

DARRIS DEWAYNE BARNES,

          Defendant - Appellant.

No. 97-6296

W.D. Oklahoma

(D.C. No. (CR-93-47-L))

---

**ORDER AND JUDGMENT**[*]

---

Before **ANDERSON**, **MCKAY**, and **LUCERO**, Circuit Judges.

---

After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist the determination of this appeal. See Fed. R. App. P. 34 (a); 10th Cir. R. 34.1.9. This cause is therefore ordered submitted without oral argument.

Darris Dewayne Barnes appeals from the sentence which the district court imposed when it revoked his supervised release. Barnes contends that 1) the

---

[*]This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

evidence was insufficient to support the court's finding that he violated his supervised release; and 2) the district court erred by imposing a sentence of imprisonment higher than the recommended range set forth in USSG § 7B1.4. We affirm.

## BACKGROUND

In 1993, Barnes pleaded guilty to possessing a firearm after having previously been convicted of a felony, in violation of 18 U.S.C. § 922(g)(1), and he was sentenced to 46 months' imprisonment and a three-year term of supervised release. Barnes completed his prison term and began his term of supervised release on July 19, 1996. The conditions of his supervised release included a prohibition on the use of illegal drugs. On three occasions Barnes tested positive for illegal drugs. As a result, on February 28, 1997, the district court modified the conditions of Barnes' supervised release to require Barnes to reside at the Oklahoma Halfway House for 120 days. R. Vol. I, tab 38.

On July 5, 1997, Barnes left the halfway house on a weekend pass which was good from Saturday, July 5 at 9:00 a.m. through Sunday, July 6 at 9:00 p.m., and which listed the times, addresses, and phone numbers for the places he expected to be for each hour he was away from the halfway house. Among other things, the pass was conditioned upon his agreement to not drink any alcoholic

beverages. R. Vol. I, tab 47 at Ex. 2. It also provided that failure to adhere to the listed itinerary could result in a charge of escape. Id.

On Sunday morning, July 6, around 3:00 a.m., police responded to a domestic dispute call at the residence of a Ms. Covington, where Barnes was staying. When they arrived, Barnes let them in, and stated that he had been drinking and that he and his wife, Ms. Covington, had been arguing. The officers then interviewed Ms. Covington and Barnes separately.

Ms. Covington told the police that Barnes' name was "William," that he did not live there, that they were not married, that he was out on a pass, and that he had "jumped on me." She was otherwise uncooperative, refusing to give her name or to state whether she wanted to press charges. Meanwhile, Barnes gave the second officer an incorrect date of birth, told him that he lived there, and gave his name as Dewayne Barnes, but indicated that he had no identification. Id. at Ex. 1; R. Vol. III at 51. Finally, Covington revealed that Barnes' name was "Dorris," and the police ran a check which showed three outstanding city warrants. R. Vol. I, tab 47 at Ex. 1.

According to the police report, Barnes became increasingly nervous during the interview. Finally, he broke for the front door and ran away, with the police chasing after him, although they were unable to catch him. At the time he ran

from police, he had not been handcuffed or arrested. Later that morning, the police contacted Barnes' probation officer to advise him of the incident.

Eventually, around 7:00 a.m. that Sunday, one of Covington's neighbors contacted the halfway house and related the morning's events. After receiving the neighbor's phone call, personnel at the halfway house attempted several times to contact Barnes at the number listed on his pass, but they were unsuccessful. They then verified that there was a pending police case for the morning's incident and that police were actively seeking him. R. Vol. III at 33, 38-39. Pursuant to policy, and consistent with the warnings stated on the pass, the halfway house personnel terminated Barnes from their program, packed up his personal belongings, and advised the bureau of prisons. Id. at 37-39.

Around 1:10 p.m. the same Sunday, Barnes appeared at the halfway house and discovered that his belongings had been packed. The resident advisor told him that he had been terminated because personnel had been unable to reach him at the place listed on his pass, and he was advised to contact his probation officer. Id. at 43. Barnes failed to contact his probation officer as instructed, and he remained at large for almost two weeks, his whereabouts unknown.

On July 10, 1997, the United States Probation Office filed a petition which sought revocation of Barnes' supervised release because of alleged violations of its conditions. The petition set out three separate categories of Barnes' violations

as follows: 1) failing the drug tests administered prior to the modification; 2) assaulting his girlfriend and eluding the police while lawfully detained, in violation of state law; and 3) absconding from the halfway house.

Barnes was finally arrested on July 23, 1997. A hearing was held on August 1, 1997, during which the government withdrew the assault allegation and also agreed that the three positive drug tests should not be used as a basis for revocation. Following the hearing, the court found by a preponderance of the evidence that Barnes 1) eluded the police, in violation of Oklahoma state law, while he was being lawfully detained at his girlfriend's house; and 2) left the halfway house in violation of the special condition of his term of supervised release. R. Vol. I, tab 48 at 6.

The applicable sentencing range for revocation of Barnes' supervised release is seven to thirteen months' imprisonment. USSG § 7B1.4(a), p.s. Based upon all the evidence presented at trial, including Barnes' continued attempt to elude police after the July 6 incident, the fact that he had given false information to police, the fact that he had previously been given favorable treatment in the assignment to the halfway house, and Barnes' criminal history, the court determined to depart upward and sentenced Barnes to eighteen months' imprisonment.

**DISCUSSION**

A. <u>Sufficiency of the Evidence</u>.

As his first claim of error, Barnes contends that the evidence was insufficient to support the district court's finding that he violated the conditions of his supervised release.

The district court must find by a preponderance of the evidence that a defendant violated a condition of supervised release. 18 U.S.C. § 3583(e)(3). We review the district court's factual findings related to sentencing for clear error, 18 U.S.C. § 3742(e); <u>United States v. Pappert</u>, 112 F.3d 1073, 1078 (10th Cir. 1997), and we review its decision to revoke a term of supervised release for abuse of discretion. <u>United States v. McAfee</u>, 998 F.2d 835, 837 (10th Cir. 1993).

Oklahoma law provides that "[i]t is unlawful for any person, after being lawfully arrested or detained by a peace officer, to escape or attempt to escape from such peace officer." Okla. Stat. Ann., tit. 21, § 444.A. Barnes contends that he did not violate the statute, because he was not being lawfully detained at the time he fled. We disagree.

It is well settled that "if there are articulable facts supporting a reasonable suspicion that a person has committed a criminal offense, that person may be stopped in order to identify him, to question him briefly, or to detain him briefly while attempting to obtain additional information." <u>Hayes v. Florida</u>, 470 U.S.

-6-

811, 816 (1985). Furthermore, "'[a] brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time.'" Id. (quoting Adams v. Williams, 407 U.S. 143, 146 (1972)); see United States v. Gonzalez-Acosta, 989 F.2d 384, 387 (10th Cir. 1993).

In this case, the evidence shows that the officers had been called out to investigate a domestic dispute, and that at the time Barnes fled, the officers were attempting to discern whether a crime had been committed and to sort out the conflicting stories and identities of the parties. Accordingly, a preponderance of the evidence[1] supports the conclusion that the Barnes was being lawfully detained, and, hence, his escape violated Oklahoma state law.

Barnes next contends that there was no evidence to support the conclusion that he absconded from the halfway house, and he points to the fact that he returned to the halfway house before the expiration time stated on his pass. Barnes' argument ignores the fact that he was in violation of several other terms of the pass, and that he failed to follow the instructions he received upon being

---

[1]Barnes also argues that there was no showing that the police report was reliable evidence. In any event, the relevant particulars were corroborated by Barnes' own testimony, as well as the testimony of the other witnesses. See R. Vol. III at 48-53, 31-32, 35, 39-41.

terminated from the halfway house program, *i.e.*, that he contact his probation officer.

Accordingly, we find that the evidence was sufficient to support the district court's conclusion that Barnes supervised release should be revoked based on the violations alleged in the government's petition.

B. Sentencing.

As his second claim of error, Barnes contends that the district court should not have imposed a sentence of imprisonment higher than the recommended range specified in USSG § 7B1.4(a).

"If the district court imposes a sentence in excess of that recommended in Chapter 7, 'we will not reverse if it can be determined from the record to have been reasoned and reasonable.'" United States v. Hurst, 78 F.3d 482, 483 (10th Cir. 1996) (quoting United States v. Lee, 957 F.2d 770, 774 (10th Cir. 1992)).

Although he concedes that the Chapter 7 ranges are advisory, Barnes contends that they "should not be abandoned except for extraordinarily compelling reasons, in atypical revocation cases." Appellant's Br. at 12. We have previously rejected the identical argument. See United States v. Burdex, 100 F.3d 882, 884 (10th Cir. 1996), cert. denied, 117 S. Ct. 1283 (1997).

Accordingly, concluding that the district court's sentence was reasoned and reasonable, we find no error.

AFFIRMED.

ENTERED FOR THE COURT


Stephen H. Anderson
Circuit Judge